**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LAUSTEVEION JOHNSON, ) | |
| ) | |
| Plaintiff, ) | Case No.: 2:17-cv-00156-GMN-DJA |
| vs. ) | |
| ) | **ORDER** |
| RASHONDA SMITH, *et al.*, ) | |
| ) | |
| Defendants. ) | |

Pending before the Court is Plaintiff Lausteveion Johnson's ("Plaintiff's") Motion for Partial Summary Judgment, (ECF No. 34). Defendants James Cox, James Dzurenda, Jo Gentry, Rashonda Smith, and Brian Williams, (collectively, "Defendants"), filed a Response, (ECF No. 41), and Plaintiff filed a Reply, (ECF No. 42).

Also pending before the Court is Defendants' Motion for Summary Judgment, (ECF No. 35). Plaintiff filed a Response, (ECF No. 39), and Defendants filed a Reply, (ECF No. 44).

Also pending before the Court is Defendants' Motion to Extend Time, (ECF No. 43). Plaintiff did not file a Response.

For the reasons discussed below, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgement, **GRANTS in part and DENIES in part** Plaintiff's Motion for Partial Summary Judgment, and **DENIES as moot** Defendants' Motion to Extend Time.

**I.   BACKGROUND**

This case arises from Plaintiff's various allegations, pursuant to 42 U.S.C. § 1983, that Defendants violated his First and Fourteenth Amendment rights, as well as the Religious Land Use and Incarcerated Persons Act ("RLUIPA"), while he was incarcerated at Southern Desert

Correctional Center ("SDCC").  Plaintiff, a Muslim, describes three events during which Defendants violated his asserted constitutional and statutory rights.

First, Plaintiff alleges that Defendants refused to allow him to purchase and wear "a silver Islamic ring with 'Allah' or 'Rasullalah' embedded into it," while Christian inmates may purchase and wear "metal/silver chains and crosses and Christ medallions." (*Id.* ¶ 2).  Second, Plaintiff claims that Defendants prohibited him from attending religious Jumah services on the following dates: June 20, 2016; June 24, 2016; July 1, 2016; July 8, 2016; July 9, 2016; July 16, 2016; and September 16, 2016. (*Id.* ¶¶ 3, 11).  Plaintiff further claims that Christian inmates were allowed to "attend Christian services on those dates." (*Id.*).  Third, Plaintiff asserts that Defendants refused "to allow [him] to attend the Eid-al-Fitr Feast in June 2016." (*Id.* ¶ 10).  Plaintiff asserts that the Eid-al-Fitr feast "is central to the Islamic faith" and is "widely known and accepted, even by [the Nevada Department of Corrections ("NDOC")]" because it is an "approved Islamic Celebration in NDOC [Administrative Regulation ("AR")] 810." (*Id.* ¶¶ 5, 10).  NDOC AR 810 allows inmates to have special holy day food at the chapel after submitting a Request for Recognized Holy Day Service/Food to the SDCC Chaplain at least thirty days before the holiday. (*See* Ex. A to Defs.' Reply, ECF No. 44-1).

Separate and apart from Plaintiff's religious rights claims, Plaintiff alleges that Defendants Smith and Gentry retaliated against him for filing grievances and lawsuits, in violation of his First Amendment rights. (FAC ¶¶ 15–18).  Specifically, Plaintiff asserts that on September 20, 2016, Defendants Smith and Gentry refused to copy seven pages of Plaintiff's legal documents because Plaintiff filed grievances against them in August and September of 2016. (*Id.* ¶ 16).  Because the documents were not copied, Plaintiff states that his claims in another case, *Johnson v. Young*, were dismissed during a trial on December 19, 2016. (*Id.* ¶¶ 6-4, 16).  Further, Plaintiff claims that Defendants Smith and Gentry "refused to put [him] on the list for the law library on September 27, 2016, out of retaliation for him filing grievances." (*Id.*

¶ 17). Finally, Plaintiff claims that Defendants Smith and Gentry did not allow Plaintiff to mail legal documents between December 28, 2016, and January 3, 2017, during a twenty-four-hour lockdown, "out of retaliation for him trying to file this lawsuit and because of the grievances that Plaintiff filed." (*Id.* ¶ 18). According to Plaintiff, the inability to mail these legal documents caused him to miss the deadline to appeal *Johnson v. Young*. (*Id.* ¶¶ 6–7, 18).

Plaintiff moves for partial summary judgment with respect to his Free Exercise, RLUIPA, and Equal Protection claims. (*See generally* Pl.'s Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 34). Defendants move for summary judgment with respect to the same, in addition to Plaintiff's retaliation claim. (*See generally*, Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 35).

## II. <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *See id.* "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 288–89 (1968)). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary

judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404,

1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.  DISCUSSION

#### A.  Exhaustion of Administrative Remedies

In their Motion for Summary Judgment, Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to bringing this action because he did not properly exhaust NDOC's grievance procedures. (Defs.' MSJ 1:22–24). In contrast, Plaintiff insists that he properly exhausted his administrative remedies for each claim. (Pl.'s Resp. at 4, ECF No. 39). The Court addresses whether Plaintiff exhausted his administrative remedies before turning to a discussion of the merits for the surviving claims.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement in prisoner cases is mandatory. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). Further, the PLRA requires "proper exhaustion" of administrative remedies. *Id.* at 93. Proper exhaustion "means that a grievant must use all steps the prison holds out, enabling the prison to reach the merits of the issues." *Griffin v. Arpaio*, 557 F.3d 1117, 1119–20 (9th Cir. 2009).

Courts should decide exhaustion before examining the merits of a prisoner's claim. *Albino v. Baca*, 747 F.3d 1162, 1170 (9th Cir. 2014). The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Id.* at 1169, 1172. Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

Defendants' Motion for Summary Judgment includes a copy of the NDOC Administrative Regulation ("AR") 740, entitled "Inmate Grievance Procedure," which catalogs the administrative remedies and associated procedures available to NDOC inmates. (AR 740, Ex. A to App. Defs.' MSJ, ECF No. 36-2). In order for a plaintiff to exhaust available remedies, AR 740 first requires the inmate to discuss the issue with a caseworker prior to initiating the grievance process. (AR 740.04 at 5). The procedure then continues as follows: (1) an Informal Grievance; (2) a First Level Grievance appealing the Informal Grievance decision to the warden; and (3) a Second Level Grievance, which is decided by the Assistant Director of Operations. (AR 740.05–.07 at 5–10). "In the event an inmate's claim is deemed inappropriate for review or not within the intended scope of this Regulation, the inmate may appeal that

decision only to the next procedural level of review." (AR 740.03(5) at 4). "An inmate who is dissatisfied with the response to a grievance at any level may appeal the grievance to the next level" within five days after the return of a decision. (AR 740.03(6) at 4).

Here, the record is devoid of evidence showing that Plaintiff filed any grievances regarding the Eid-al-Fitr feast in June of 2016 or Jumah services on June 20, 2016, July 9, 2016, and July 16, 2016. As such, the Court finds that Plaintiff failed to exhaust his administrative remedies and grants summary judgment in favor of Defendants with respect to these claims.

Plaintiff did file grievances concerning the Islamic Ring, Jumah services on June 24, 2016; July 1, 2016; July 8, 2016; and September 16, 2016, and his retaliation claim. To determine whether Plaintiff properly exhausted the available administrative remedies pursuant to the PLRA, the Court addresses each of Plaintiff's grievances in turn.

**1. Islamic Ring Grievance**

Plaintiff provides copies of the informal and first level grievances submitted about Defendants' alleged refusal to allow him to purchase an Islamic ring.[1] (Ex. A to Pl.'s Resp., ECF No. 39). While Plaintiff admits that he filed no second level grievance, he still claims proper exhaustion because Defendants never responded to his grievances and "AR 740 does not say what to do if they do not respond." (Pl.'s Resp. at 6 (*citing Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005) (finding that a grievant who receives no response has exhausted where the grievance policy did not say what to do absent a response because the grievance process is effectively unavailable))).

---

[1] The Islamic ring grievances submitted by Plaintiff lack grievance numbers and grievance coordinator signatures. For this reason, Defendants claim that these grievances should not be considered by the Court because there is no indication that they were ever submitted to the grievance coordinator. (Defs.' Reply 4:12 –20, ECF No. 44). However, because Plaintiff did not file a second level grievance, the claim will not proceed, and the Court declines to address the validity of the informal and first level grievances.

However, AR 740.03 states that "the inmate may proceed to the next grievance level . . . if a response is overdue." (AR 740.03, Ex. A to App. Defs.' MSJ).  Therefore, Defendants claim that "the failure to respond to the grievance does not render the grievance process unavailable because inmates can still appeal the grievance to the next level." (Defs.' Reply 5:15–16, ECF No. 44).  The Court agrees and finds that Plaintiff failed to exhaust his administrative remedies, and grants summary judgment for Defendants with respect to Plaintiff's Islamic ring claim.

**2. Jumah Services Grievances**

Plaintiff submitted Grievance 2006-30-29832 ("Grievance 29832") about missing Jumah services on June 24, 2016, and Grievance 2006-30-29830 ("Grievance 29830") about missing Jumah services on July 8, 2016. (Ex. H to App. Defs.' MSJ, ECF No. 36-14); (Ex. N to App. Defs.' MSJ, ECF No. 36-20).  Defendants concede that Plaintiff properly exhausted Grievances 29832 and 29830. (Defs.' MSJ 4:17–18, 5:19–20).

Plaintiff submitted Grievance 2006-30-29831 ("Grievance 29831") about missing Jumah services on July 1, 2016, which was appealed to the second level. (Ex. Q to App. Defs.' MSJ, ECF No. 36-23).  Defendants state that Grievance 29381 is duplicative.[2] (Defs.' MSJ 6:3–5).  However, there is no evidence in the record to suggest that Grievance 29831 is duplicative because it is the only grievance concerning Jumah services on July 1, 2016.  Therefore, the Court finds that Plaintiff properly exhausted his claim with respect to Jumah services on July 1, 2016.

Finally, Plaintiff submitted Grievance 2006-30-34186 ("Grievance 34186") about missing Jumah services on September 16, 2016. (Ex. R to App. Defs.' MSJ, ECF No. 36-24).  Grievance 34186 was not accepted at the informal level because Plaintiff failed to file Form DOC-3095, as required by AR 740.05 for civil rights claims requesting monetary damages.

---

[2] Defendants do not specify with which grievance it is allegedly duplicative.

(*See* Ex. R to App. Defs.' MSJ); (AR 740.05(7)(B), Ex. A to App. Defs.' MSJ). When an inmate fails to submit a proper informal grievance form, the grievance is considered abandoned at the informal and all other levels. (AR 740.05(8)). Plaintiff disregarded AR 740.05 and proceeded to file a first level grievance, which was rejected, and he was instructed to first file an informal grievance. (*See* Ex. R to App. Defs.' MSJ).[3] Plaintiff did not refile his informal grievance because he claims that he attached Form DOC-3095 to the original informal grievance. (*See* Pl.'s Resp. at 7). However, there is no evidence in the record indicating that Plaintiff attached Form DOC-3095. Furthermore, regardless of whether Plaintiff initially attached the form, Plaintiff still could have exhausted his administrative remedies by refiling the informal grievance with Form DOC-3095. Because Plaintiff did not refile at the informal level, he could not appeal to the first and second levels, and thus, did not exhaust his administrative remedies. Accordingly, the Court grants summary judgment in favor of Defendants with respect to Plaintiff's claim that he missed Jumah services on September 16, 2016.

### 3. Retaliation Grievances

Plaintiff submitted Grievance 2006-30-41140 ("Grievance 41140") claiming that Defendant Smith, the SDCC librarian, refused to copy seven pages of "legal copy-work" out of retaliation. (Ex. H to Pl.'s Resp., ECF No. 39); (FAC ¶ 16). Grievance 41140 was properly appealed to the second level. (*Id.*). Additionally, Plaintiff submitted Grievance 2006-30-34485 ("Grievance 34485") claiming that Defendant Smith refused to schedule Plaintiff for time in the law library, again out of retaliation. (Ex. I to Pl.'s Resp.). Grievance 34485 was also properly appealed to the second level. (*Id.*). Finally, Plaintiff submitted Grievance 2006-30-41150 ("Grievance 41150"), in addition to two emergency Grievance forms, concerning his inability

---

[3] Plaintiff also asserts that he was not allowed to file a second level grievance. (Pl.'s Resp. at 7). However, Plaintiff's inability to file a second level grievance is not contrary to law because he improperly filed his informal and first level grievances.

to send out legal mail, in violation of his First Amendment rights, during an institutional lockdown. (Ex. J to Pl.'s Resp.). Grievance 41150 was also properly appealed to the second level. (*Id.*). Accordingly, Plaintiff properly exhausted his administrative remedies, and his First Amendment retaliation claim may proceed. Below, the Court discusses the merits of the surviving claims regarding Jumah services on June 24, 2016, July 1, 2016, and July 8, 2016, as well as retaliation.

**B. Merits of Plaintiff's Jumah Services Claims**

Plaintiff alleges that each missed Jumah service violated his First Amendment right to free exercise of religion, RLUIPA, and the Equal Protection clause of the Fourteenth Amendment. The Court discusses Plaintiff's constitutional and statutory rights with respect to each allegation of missed Jumah services in turn.

*1. First Amendment Free Exercise Claims*

Prisoners retain their First Amendment rights while incarcerated, including the right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). The right to free exercise of religion, however, "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987).

"A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031–32 (9th Cir. 2015). The Ninth Circuit has found that a prison policy prohibiting inmates from attending group religious services is a substantial burden on the practice of religion. *See Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008) ("[the] jail's policy of prohibiting [Plaintiff], a maximum security prisoner, from attending group religious services substantially burdened his ability to exercise his religion."). However, "isolated incidents" or "sporadic" events do not substantially burden the practice of religion.

*See, e.g.*, *Brown v. Washington*, 752 Fed. Appx. 402, 405 (9th Cir. 2018); *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998). Further, to merit protection under the free exercise clause, the claimant's proffered belief must be sincerely held. *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981). Nonetheless, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

In the present case, Plaintiff has met his burden to show his religious belief is sincerely held; Plaintiff states that he practices Islam sincerely, and nothing in the record contradicts him. (Pl.'s MSJ at 4, 5). However, the Court finds that Defendants did not substantially burden Plaintiff's religious practice because isolated incidents justified by institutional needs interfered with Plaintiff's ability to attend Jumah services.

Plaintiff claims that his practice of Islam was substantially burdened on June 24, 2016, July 1, 2016, and July 8, 2016, because he missed Jumah services, and "attend[ing] Jumah Islamic prayer services every Friday . . . is a bona fide mandatory part of the Islamic faith," (*Id.* at 5). Nonetheless, Defendants demonstrate that on both July 1, 2016, and July 8, 2016, SDCC experienced institutional emergencies, which required the cessation of inmate movement. (*See* Ex. N to App. Defs.' MSJ); (Ex. Q to App. Defs.' MSJ). As a result, Plaintiff was not allowed to leave his unit, and thus missed Jumah services. (*Id.*). However, Plaintiff presents no evidence to indicate that an institutional emergency is anything more than an isolated and sporadic incident that coincidentally interfered with the timing of Jumah services. Further, the cessation of inmate movement as a result of an emergency is not a policy to prohibit religious services; it is a policy to provide for the safety and security of the institution. (*See* Ex. N to App. Defs.' MSJ); (Ex. Q to App. Defs.' MSJ). Therefore, Plaintiff's practice of religion was not substantially burdened, and the Court grants summary judgment in favor of Defendants

with respect to Plaintiff's First Amendment claims regarding the July 1, 2018, and July 8, 2016, Jumah services.[4]

Defendants also explain that on June 24, 2016, Plaintiff was denied access to Jumah services because Chaplain Youngblood was not on site, and SDCC policy prohibits religious services when "the Chaplain and religious volunteers are not present." (*See* Ex. H to App. Defs.' MSJ); (AR 810.3, Ex. A to Defs.' Reply).[5] In this circumstance, an institutional policy directly prohibits religious services, which substantially burdens Plaintiff's practice of religion. *See Greene*, 513 F.3d at 988; (AR 810.3, Ex. A to Defs.' Reply). *See also Spratt v. R.I. Dept. Corr.* 482 F.3d 33 (1st Cir. 2007) (holding that a prison's ban on inmate led services constituted a substantial burden); *Woods v. Staton*, No. 3:15-cv-02169-PK, 2017 WL 3623797, at *1 (D. Or. Aug. 23, 2017) (adopting a Report and Recommendation from the Magistrate Judge, which states "the Court has no difficulty in concluding that the denial of group prayer services constitutes a substantial burden to religious exercise").

However, even though Plaintiff has met his burden to demonstrate that Defendants substantially burdened Plaintiff's practice of religion, Defendants have also met their burden to show that requiring outside supervision for inmate religious services is reasonably related to the legitimate penological interest of institutional security. The Ninth Circuit recognizes a

---

[4] Even if Plaintiff's practice of religion was substantially burdened by missing services because of an institutional emergency, his First Amendment rights were still not violated. An inmate's First Amendment rights can be limited to "maintain prison security," and the Court acknowledges that there is a reasonable relationship to a legitimate penological interest by prohibiting Plaintiff from attending Jumah services during an emergency in order to "provide for the safety and security of the institution." *See* McElyea v. Babbit, 833 F.2d 196, 197 (9th Cir. 1987); (Ex. N to App. Defs.' MSJ, ECF No. 36-20); (Ex. Q to App. Defs.' MSJ, ECF No. 36-23).

[5] Plaintiff claims that no such policy exists, however, AR 840.3 states that "inmates have no rights to facilitate or lead services . . . it is the sole discretion of each institution/facility to allow inmates to facilitate religious services." (AR 840.3, Ex. A to Defs.' Reply, ECF No. 44-1). Further, "in the event there is no Chaplain or Volunteer to facilitate a religious meeting the Chaplain and Associate Warden may appoint up to two (2) inmates to facilitate the service," but are not under an obligation to do so. (*Id.*). Finally, even if there is an inmate facilitator, "the Chaplain retains complete management, control, and authority over all services" and "this responsibility will not be delegated to an inmate facilitator." (*Id.*).

legitimate penological interest in "requiring an outside minister to lead religious activity among inmates" because "it helps ensure that inmate activity is supervised by responsible individuals and lessens the possibility that inmate religious groups will subvert prison authority." *Anderson v. Angelone,* 123 F.3d 1197, 1198–99 (9th Cir. 1997) ("Nevada's prohibition on inmate-led religious services does not violate the First Amendment"). *See also Countryman v. Palmer*, No. 3:11-cv-00852-ECR-VPC, 2012 WL 4339048, at *1 (D. Nev. Sept. 19, 2012) (adopting the Magistrate Judge's report and recommendation that there is "a legitimate penological interest in requiring volunteers to be present during indoor religious events" due to safety risks).  For this reason, the Court finds that prohibiting Plaintiff from attending Jumah services when the Chaplain was not present is reasonably related to a legitimate penological interest. Accordingly, the Court grants summary judgment in favor of Defendants with respect to Plaintiff's First Amendment claims concerning Jumah services on June 24, 2016.

    2. *RLUIPA Claims*

As a preliminary matter, Plaintiff may not state a RLUIPA claim for damages against prison officials in their individual capacities. *See Wood v. Yordy*, 753 F.3d 899, 901 (9th Cir. 2014).  Therefore, the Court grants summary judgment in favor of Defendants Williams, Youngblood, Gentry, Cox, and Dzurenda to the extent that Plaintiff seeks damages from them in their individual capacities under RLUIPA.  The only claims that can proceed are those against Defendants Williams, Youngblood, Gentry, Cox, and Dzurenda for injunctive relief. *See Ex Parte Young*, 209 U.S. 123 (1908).

RLUIPA expands rights under the First Amendment's Free Exercise Clause, mandating that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person–
>  (1) is in furtherance of a compelling governmental interest; and

    (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)–(2).  A prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation. *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015).

  Under RLUIPA, "religious exercise" is broadly defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).  The Supreme Court has emphasized that RLUIPA does not override an institution's safety and security interests, stating "[w]e have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  However, the Ninth Circuit requires prison officials to "justify restrictions on religion exercise [by more than] simply citing the need to maintain order and security in a prison . . . [p]rison officials must show that they actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Green*, 513 at 982, 989–90.

  Here, as noted in the First Amendment analysis, Defendants did not impose a substantial burden on Plaintiff's practice of religion on July 1, 2016, and July 8, 2016, and thus, the Court grants summary judgment in favor of Defendant with respect to Plaintiff's RLUIPA claims for those dates.  However, the Court does find that Defendants imposed a substantial burden on Plaintiff by prohibiting him from attending Jumah services when the Chaplain was not available.  Therefore, the burden now shifts to Defendants to show that their policy of prohibiting religious services when a Chaplain or volunteer is not present is "in furtherance of a compelling governmental interest" and "is the least restrictive means" of furthering that interest. 42 U.S.C. § 2000cc-1(a)(1)–(2).  Specifically, Defendants must show that they

considered less restrictive measures than cancelling religious services when the Chaplain was unavailable. *See Green*, 513 at 989–99.

Defendants argue that they had a legitimate penological interest in institutional security by cancelling Jumah services on June 24, 2016, when the Chaplain was not available. However, a legitimate penological interest is only a consideration in the First Amendment analysis; RLUIPA analysis subjects the institutional policy to strict scrutiny, which Defendants failed to address. Even if Defendants presented a compelling government interest, such as prison security, there is still no evidence in the record to suggest that cancelling unsupervised services is the least restrictive means of furthering that interest. Moreover, Defendants present no discussion of any consideration of less restrictive measures. As such, Defendants have not met their burden to show that cancelling Jumah services on June 24, 2016, furthered a compelling government interest by the least restrictive means. Thus, the Court denies Defendants' Motion for Summary Judgment, and grants Plaintiff's Motion for Partial Summary Judgment with respect to Plaintiff's RLUIPA claims concerning Jumah services on June 24, 2016.

However, the injunctive relief sought by Plaintiff is overly broad. (FAC at 9 (requesting "injunctive relief to correct the errors named herein")). Plaintiff fails to specifically address the relief sought for missing Jumah services on June 24, 2016. In fact, Plaintiff applies his prayer for relief generally to all of the claims contained within his Complaint without designating the type of relief requested for each claim. The Court "shall not grant or approve any prospective relief unless . . . such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Accordingly, Defendants are hereby enjoined from prohibiting Plaintiff from attending Jumah services in the Chapel when the Chaplain or a volunteer is unavailable without first considering alternatives to simply cancelling the service.

### *3. Fourteenth Amendment Equal Protection Claims*

Plaintiff claims that Defendants violated his Fourteenth Amendment right to equal protection by prohibiting him from attending Muslim Jumah services on June 24, 2016, July 1, 2016, and July 8, 2016, while allowing Christians to attend their religious services on those same dates. (FAC ¶ 11). [6] "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Or.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "[T]o state an equal protection claim, plaintiffs must show they were intentionally and purposefully 'treated differently [by the defendants] ... because [they] belonged to a protected class.'" *Egberto*, 2011 WL 1233358, at *12 (quoting *Hill v. Washington State Dep't of Corr.*, 628 F. Supp. 2d 1250, 1263 (W.D. Wash. 2009)). "Showing that different persons are treated differently is not enough to show a violation of equal protection." *Id.*

However, the Court's review of prison policies and actions is tempered by the recognition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). A "prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests" and not an exaggerated response to a particular concern. *Turner*, 482 U.S. at 89.

---

[6] While Defendants' Motion for Summary Judgment does not explicitly address Plaintiff's Fourteenth Amendment claims, the Court notes that Defendant moves for Summary Judgment with respect to "Count I," which includes Plaintiff's First Amendment, RLUIPA, and Fourteenth Amendment claims. (Defs.' MSJ 6:22); (FAC at 4). Because Plaintiff used the same arguments to support all three claims, the Court will address the implications of those arguments as they apply to the Fourteenth Amendment claim.

As a Muslim, Plaintiff is a member of a protected class. *See, e.g.*, *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007) (recognizing that protected classes include religious groups). Additionally, Defendants do not dispute Plaintiff's claims that Christian inmates were allowed to attend religious services while Muslim inmates were not on June 24, 2016, July 1, 2016, and July 8, 2016. However, even if Defendants did treat Plaintiff differently than Christian inmates, Plaintiff has provided no evidence to indicate that he was prohibited from attending religious services because he is a Muslim. To the contrary, Plaintiff was prohibited from attending Jumah on the dates and times in question because either an institutional emergency resulted in all inmate movement being suspended, or there were no volunteers available to supervise the Chapel. (*See* Ex. H to App. Defs.' MSJ); (Ex. N to App. Defs.' MSJ); (Ex. Q to App. Defs.' MSJ). Further, as noted in connection with Plaintiff's First Amendment claim, prohibiting attendance at religious services to preserve the safety and security of the institution is reasonably related to a legitimate penological interest, and thus does not violate Plaintiff's constitutional rights. Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiff's First Amendment claims regarding Jumah services on June 24, 2016, July 1, 2016, and July 8, 2016.

**C. Merits of Plaintiff's First Amendment Retaliation Claims**

"Prisoners have a First Amendment right to file grievances against prison officials and be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). In the prison context, a claim for First Amendment retaliation under § 1983 must establish five elements: "(1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

Here, Plaintiff argues that Defendants Smith and Gentry retaliated against him for filing grievances and lawsuits, a protected activity under the First Amendment. (FAC ¶¶ 16–18). Specifically, Plaintiff claims that Defendants Smith and Gentry: (1) refused to copy or return seven pages of legal copy-work; (2) refused to put Plaintiff on the law library list on September 27, 2016; and (3) refused to let Plaintiff send out legal mail during a twenty-four-hour lockdown. Defendants Smith and Gentry move for summary judgment arguing that "there was no evidence of retaliatory intent" beyond Plaintiff's "unsupported allegation[s]." (Defs.' Reply 12:17–27).

To satisfy the "retaliatory motive" element of a retaliation claim, a plaintiff must show that his First Amendment activity was "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). The evidence establishing such a motive is often circumstantial, *see id.*, but "mere speculation that defendants acted out of retaliation is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014).

Here, aside from mere assertions, Plaintiff presents no evidence that Smith and Gentry's actions were motivated by the grievances and lawsuits filed against them.[7] Plaintiff's mere speculation that there is a causal connection is not enough to raise a genuine issue of material fact. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).

Moreover, Plaintiff admits that Defendant Smith denied his request for copies because he had reached the legal limit for copy-work, and not because of any retaliatory intent. (Ex. D-2 to App. Defs.' MSJ). Likewise, Plaintiff admits that he was unable to mail out legal documents because Defendants Smith and Gentry "didn't have a policy in place that allows inmates to

---

[7] Plaintiff provided copies of his grievances showing that Defendants Smith and Gentry had responded to them. (*See generally* Exs. A–M to Pl.'s Resp., ECF No. 39). However, the mere fact that Defendants acknowledged the grievances does not establish a causal connection between Plaintiff's filing of grievances and the alleged adverse actions.

send out legal mail" during a lockdown. (FAC ¶ 6-5). Consequently, the motivating factor behind Plaintiff's inability to send his legal mail was an institutional policy failure, but not retaliatory. Accordingly, the Court grants summary judgment in favor of Defendants Smith and Gentry.[8]

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment, (ECF No. 34), is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 35), is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Extend Time, (ECF No. 43), is **DENIED as moot**.

**IT IS FURTHER ORDERED** that the First Amended Complaint, (ECF No. 7), is **DISMISSED without prejudice** against Defendant Johnny Youngblood for failure to properly serve him under Federal Rule of Civil Procedure 4(m).[9]

**IT IS FURTHER ORDERED** that the Clerk's Office shall enter judgement accordingly.

**DATED** this __25__ day of November, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court

---

[8] Plaintiff's Motion for Partial Summary Judgment, (ECF No. 34), only covered Plaintiff's First Amendment Free Exercise, RLUIPA, and Fourteenth Amendment claims. He did not move for summary judgment with regards to his First Amendment retaliation claim.

[9] On March 29, 2020, the Court filed a notice to Plaintiff, (ECF No. 52), which explained that if Plaintiff did not properly serve Defendant Youngblood by April 28, 2020, the Court would enter an Order of Dismissal under Federal Rule of Civil Procedure 4(m). The deadline to do so has now passed and no proper proof of service as to Defendant Youngblood has been filed.